**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14 CR 241** |
| | ) | |
| **JASON WEBER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

In December 2015, Jason Weber pled guilty to a charge of theft of government funds. At the time of the offense, Weber was serving as a postal inspector with the U.S. Postal Inspection Service. In June 2016, the Court sentenced him to a two-year term of probation and ordered him to pay $65,634 in restitution. He has filed his third post-conviction motion—a renewed petition for a writ of coram nobis. Weber contends that the totality of "newly discovered evidence" included in his post-conviction filings reflects that he is innocent of the crime to which he pled guilty. For the reasons stated below, the Court denies Weber's petition.

## Background

Weber was originally indicted on a charge of mail fraud alleging a scheme to defraud the Postal Service by submitting false claims to recover for insured parcels that purportedly had been lost in the mail. In December 2015, Weber pled guilty to a superseding information that charged a single count of theft of about $1,800 in

government funds. In his plea agreement, he also admitted to "relevant conduct"—

other related criminal conduct—involving conversion of about $65,000 in government

funds. The Court quotes verbatim the factual basis for Weber's guilty plea as set forth

in his plea agreement, including the other criminal conduct that he admitted:

> On or about May 21, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, JASON WEBER, defendant herein, did knowingly convert to his own use money of the United States, namely approximately $1,805 in indemnity insurance funds administered by the United States Postal Service, an agency of the United States, which funds defendant was not entitled to receive.
>
> Specifically, on or about May 21, 2013, defendant was in possession of a United States Postal Service ("Postal Service") indemnity insurance check in the amount of approximately $1,805, that was made payable to James Olson. Defendant endorsed this check and deposited it into his Bank of America account, and thus knowingly converted the funds to his own use knowing that he was not entitled to these funds.
>
> In addition to this check, between on or about December 21, 2010, and on or about July 15, 2013, defendant stipulates that a total of approximately 19 checks totaling approximately $65,634 in Postal Service indemnity insurance payments were deposited into bank accounts controlled by defendant. Defendant knowingly converted these funds to his own use.

Plea Agr. ¶ 6.

The plea agreement's description of the charge in the information makes it sound

like Weber simply took a check payable to someone else and deposited it into his own

account. Actually the offense, as alleged by the government, was more complicated

than that. The government contended that Weber purchased insurance for packages

he shipped via the Postal Service under various names, claiming that these packages

contained valuable items, when in fact they did not. He submitted to the Postal Service

insurance claims supported by fabricated receipts for the supposedly valuable items in

the packages, which triggered the payments referenced in the plea agreement. Though

the checks were made payable to a number of names, they were all deposited into bank accounts over which Weber had control.

About a week before Weber's scheduled sentencing hearing in March 2016, prosecutors and the Postal Service's Office of Inspector General received an anonymous email alleging that Weber's ex-wife, Zina Weber, had engaged in misconduct with a potential government witness (an allegation the government later reported was unfounded). (From here on in, for the sake of simplicity, the Court will refer to Jason Weber as "Weber" and to Zina Weber as "Zina.") Weber asked the Court to reschedule the sentencing hearing, and the Court did so, resetting it to June 2016. On the morning of the rescheduled hearing, the prosecutor provided to Weber's attorney a copy of a check to Zina, dated in April 2016, paying on a postal insurance claim. The prosecutor told Weber's lawyer that Zina stated that she had not made the insurance claim on which the check was issued.

At the sentencing hearing, Weber's attorney read into the record an e-mail that Zina had allegedly sent to Weber in December 2015. It contained vindictive comments suggesting that Zina had caused Weber to take the fall for her own wrongdoing.

As indicated earlier, the Court imposed a sentence of probation and ordered restitution. Weber did not appeal.

About two years later, in April 2018, Weber—represented by different counsel— filed a motion under Federal Rule of Criminal Procedure 33, alleging that the government had withheld exculpatory evidence. Specifically, he "contend[ed] that the government knew about and failed to turn over fraudulent insurance claims that were nearly identical to the ones he was accused of submitting but that were filed after he

3

was terminated from the Postal Service." *United States v. Weber*, No. 14 CR 241, 2019 WL 1317731, at *2 (N.D. Ill. Mar. 22, 2019). Weber argued that this evidence tended to show that someone else—specifically his ex-wife Zina—had committed the offense without his involvement and that this exculpated him.

In response, the government denied withholding exculpatory evidence. It pointed out that, on the very day Weber had pled guilty back in December 2015, it had disclosed "several fraudulent insurance claims that were filed after Weber left his postal employment" that were "substantially identical to the ones Weber contend[ed] were withheld and included the same fraudulent receipts for valuables." *Id.* The government also pointed to the aforementioned insurance payment that it had disclosed to defense counsel prior to Weber's sentencing.

The Court denied Weber's motion, concluding that it was not a proper motion under Rule 33—a motion for a new trial—because there had been no trial in the first place, as Weber had pled guilty. *Id.* Instead, the Court concluded, the proper vehicle for relief was a motion under 28 U.S.C. § 2255. Because Weber had asked the Court to construe his motion, in the alternative, as a section 2255 motion, the Court addressed it as such. The Court found that the motion was untimely because it had not been filed within the one-year limitations period for section 2255 motions. The Court went on to conclude that, even if timely, "Weber's 2255 motion would also fail on the merits." *Id.* at 3. Specifically, the Court found that "the government did not suppress the fraudulent insurance claims that Weber contends prove his innocence." *Id.* In other words, there was no *Brady* violation.

In 2020, Weber filed what he called a "renewed" motion, initially under section

4

2255, which he then asked the Court to construe as a petition for a writ of coram nobis.

Here is how the Court summarized that motion:

> Although Weber, in part, recycled the arguments from his 2018 motion, he also submitted additional evidence. In his view, this newer evidence not only further demonstrates his wife's culpability, but also demonstrates that two others—his former neighbor, Lawrence Ballack, and a prosecutor in his case, William Novak—were all perpetrating the scheme for which he was convicted.

*United States v. Weber*, No. 14 CR 241, 2021 WL 2222650, at *2 (N.D. Ill. June 2, 2021) (cleaned up). Weber attached the following documents to his 2020 motion. First, he submitted an eBay receipt—dated December 20, 2017—for an Apple Watch purportedly sold by "Billy Novak" for $290.00. Second, Weber offered a receipt for USPS insurance purchased for a package sent on December 22, 2017. Third, Weber presented a photocopy of the front-side of a USPS drafted check dated January 23, 2018 and made payable to "W.P. Novak," in the amount of $297.20. Fourth, he attached the front side of another check, also dated January 23, 2018, from Zina and made payable to the American Airlines Credit Union.[1] The final attachment was a photocopy of a Visa debit card with the name "Lawrence Ballack" on it.

In his 2020 motion, Weber argued two allegedly "fundamental errors" that he contended entitled him to relief: there was evidence of his actual innocence, and (as he had argued in his 2018 motion) the government had failed to disclose exculpatory evidence. *Id.* The Court concluded that the evidence Weber offered did not substantiate his allegations that others had actually perpetrated the scheme. The

---

[1] The check payable to Novak and the check payable to American Airlines Credit Union have the same routing and account numbers.

Court's ultimate determination was that "Weber has not established that there was a fundamental error that would undermine confidence in his conviction." *Id.* at *3.

In 2022, Weber submitted the present petition, another petition for coram nobis seeking to vacate his conviction. Weber again recycled his arguments from his two previous post-conviction filings, but he also included two new documents. First, he attached a statement purportedly signed by his ex-wife Zina in December 2021 that includes statements related to claimed government misconduct and Ballack's involvement in submitting fraudulent insurance claims. *See* Def.'s Ex. A (dkt. no. 113). Second, he attached a check made payable to "Justin Kopale" and a related insurance claim receipt. *See* Exs. B, C (dkt. no. 113). Weber argued in his renewed petition that these documents, together with the other evidence previously submitted, show he is innocent and that there was government misconduct.

The Court held an evidentiary hearing on the most recent petition. Weber, Zina, and Novak testified, along with a postal inspector, Mark Pulido, who summarized evidence relating to Weber's guilt.

The purported statement by Zina reads as follows:

I, ZINA WEBER, state the following:

1. I was promised by the government help in obtaining custody of my daughter if Jason Weber was convicted. The government reneged on this promise.

2. I was asked to help their case by having Jason Weber arrested on a trumped-up charge. In April of 2014 at the request of the government I called 911 to claim Jason Weber had assaulted me. I signed the complaint a few days later and he was arrested.

3. I have first-hand knowledge Lawrence Ballack submitted insurance claims as early as 2010.

4. I have first-hand knowledge Lawrence Ballack deposited a fraudulently obtained postal insurance check into a Bank of America account in his name in 2017. The check was made payable to a J. Kapole.

5. I have first-hand knowledge Lawrence Ballack mailed an insured package that resulted in an insurance check being received by William Novak.

6. I was threatened by AUSA Novak in March of 2016 during the investigation which resulted in the sentencing delay. During this delay I was interviewed by phone. I was told not to mention the check I had turned in or any other knowledge I may have had about any other outstanding claims that went against the government narrative until after sentencing otherwise there would be severe consequences for me.

7. I have first-hand knowledge Novak received a postal insurance check made payble to him in January 2018 and became very upset upon receiving it and threatened me regarding it.

8. In November of 2015, right before trial, I was asked to have Jason arrested again to make it difficult for him to prep for trial and his testimony.

Respectfully submitted

Date December 17, 2021

ZINA WEBER

At the hearing, Weber also pointed to (among other things) a text message he claimed Zina sent him in 2014 and an email she sent him in 2015. In the 2014 text message attributed to Zina, she said that she couldn't believe the government was charging him with fraud and that the fraud was the idea of her then boyfriend. In the July 2015 email attributed to Zina, she essentially said that she framed Weber.

## Discussion

A petition for writ of coram nobis is "a rare form of collateral attack on a criminal

judgment." *United States v. Delhorno*, 915 F.3d 449, 450 (7th Cir. 2019). Though it is like a petition for writ of habeas corpus and affords the same relief, coram nobis is available only to defendants who are out of custody and therefore may no longer petition for habeas corpus. *Id.* at 452. Coram nobis is available to correct factual and legal errors in criminal cases where the defendant: (1) alleges an error "of the most fundamental character" enough to "render the criminal conviction invalid"; (2) provides "sound reasons" for his "failure to seek earlier relief"; and (3) demonstrates that he "continues to suffer from his conviction even though he is out of custody." *Id.* at 450–451 (internal quotation marks omitted). "It is presumed the proceedings were correct and the burden rests on the accused to show otherwise." *United States v. Morgan*, 346 U.S. 502, 512 (1954). *See also, e.g., United States v. Wilkozek*, 822 F.3d 364, 368 (7th Cir. 2016); *United States v. Keane*, 852 F.2d 199, 205–06 (7th Cir. 1988) (denying defendant's petition for writ of coram nobis in part due to his failure to demonstrate that a "fundamental defect that produce[d] a complete miscarriage of justice" occurred in his case).

The Court first discusses the key evidence offered by Weber in support of his petition, beginning with the purported written statement by Zina. The statement is unsworn, and during her testimony at the hearing, Zina denied that she had signed or written it. The statement's provenance, even taking Weber's testimony on that point as true, is somewhat murky. Weber contends that Zina physically gave him the statement (under circumstances that are less than clear), but he has offered no evidence regarding who prepared it. On the other hand, the signature on the statement is arguably similar to at least one other signature of hers that was introduced into

8

evidence.  And generally speaking, the Court did not find Zina to be a particularly credible witness when testifying.  But that does not mean that everything she said was a lie or even incorrect.  Zina testified, credibly in the Court's view, that she does not know the meaning of two key terms that appear in the statement:  "AUSA" and "reneged." Having heard and observed extensive testimony by Zina at the hearing and having thereby familiarized itself with her manner of communicating, the Court is confident that she did not author the statement herself.  And, as indicated, Weber offered no evidence regarding the statement's provenance (i.e., how it came into being).

Notably, however, even if what Zina purportedly said in the statement is accurate, it does not tend to establish Weber's innocence of the crime and relevant conduct to which he pled guilty.  The statement claims unspecified "first-hand" knowledge of misconduct by someone named Lawrence Ballack and receipt of a postal insurance check by Novak.  But it does not say or even hint that Weber did not himself knowingly convert postal insurance proceeds to which he was not entitled, as he admitted under oath at his guilty plea hearing.  To put it another way, the proposition that Ballack committed similar criminal acts does not mean, or even suggest, that Weber did not also do so himself.

That aside, Weber offered no evidence, independent of the purported statement by Zina, that Ballack had submitted false postal insurance claims or had received or deposited the proceeds of any postal insurance claims.  Weber did not call Ballack as a witness at the hearing.  And the government offered evidence that, when interviewed by postal inspectors, Ballack denied knowing Zina or Weber and denied submitting any

9

postal insurance claims. The Court found Weber's contentions regarding Ballack unpersuasive.

As for (now) former AUSA Novak's purported receipt of postal insurance proceeds, Weber offered no evidence of any deposits by Novak or anything, aside from Zena's purported written statement, that supported a contention that the prosecutor was involved in the criminal scheme that led to Weber's guilty plea or a similar scheme. Novak did testify at the hearing, and he denied Weber's contentions. The Court found his testimony—including his denial of receipt of any insurance checks—credible in its entirety.

As for the rest of the purported written statement by Zina, it does not assist Weber here. The contention that Zina was importuned by a federal prosecutor to initiate false domestic violence charges against Weber is not otherwise supported and is not credible in the Court's view. And even if it was credible, this has no bearing on whether Weber committed the offenses he admitted in the plea agreement and during his guilty plea hearing.

Jason Weber is not a particularly credible witness either. He is either an admitted cheat, or an admitted perjurer, or both. When he pled guilty, he admitted stealing over $65,000 in government funds to which he was not entitled. And the offense and relevant conduct involved repeated transactions, not just a one-off theft. Weber made this admission both in writing—in the plea agreement—and under oath at the guilty plea hearing. On the other hand, if one believes what Weber is saying now, the very premise of his current version of the events is an admission of perjury—i.e., that his earlier admissions made while testifying under oath were false.

10

The Court also notes that, at the hearing, the government presented persuasive evidence of Weber's guilt regarding the offense of conviction and the relevant conduct that he admitted. The factual basis for Weber's plea relied on two categories of evidence: (1) a May 2013 indemnity insurance check in the amount of $1,805, made payable to James Olson, that Weber deposited into his Bank of America account and (2) nineteen other indemnity insurance checks totaling over $65,000 were deposited into bank accounts Weber controlled. First, the May 2013 insurance claim was mailed and registered under a different name—James Olson. But the Saks Fifth Avenue receipt submitted in support of this claim is strikingly similar to a Saks receipt Weber emailed himself as a PDF named "Saks Final 2500." Saks informed the government that none of the order details on these receipts were legitimate. Weber deposited the claim check into his own bank account, even though it was not in his or his ex-wife's name. Second, the government presented evidence of nineteen other fraudulent insurance claims and related checks. Though the checks were made payable to a number of names, Weber testified that he deposited all of them into his bank accounts. Novak and Pulido testified that it was extremely unusual for nineteen insured packages sent by one person to go missing over a three-year period. As a postal inspector, Weber would have known that he deposited an abnormally high number of claim checks.

Having considered all the evidence, the Court believes the veracity of the statements that Weber made in his plea agreement and at the guilty plea hearing, not his current version. The Court also notes that there is no viable contention (and in fact Weber does not contend) that he did not understand the import of what he said, both in

writing and under oath, at the time of his guilty plea. Nor could there be. We are not talking here about an unsophisticated individual whose appearance in court in this case represented his first experience with the legal system. Rather, Weber was a U.S. Postal Service postal inspector whose very profession involved investigating crimes, referring cases for prosecution in court, working with prosecutors, and testifying. His testimony that he did not commit the offenses (the crime of conviction and the relevant conduct) that he admitted in his guilty plea was not persuasive and, in the Court's view, was not credible.

Finally, as for the 2014 text message and the 2015 email, both allegedly from Zina, the most salient point is that if they are authentic, Weber had both of them before he pled guilty. And if, as Weber now contends, he did not participate in the crimes or was duped into doing so, he obviously knew that at the time. As a defendant accused in a criminal case, he had the ability to issue subpoenas and obtain evidence regarding the claimed participation of others in the offenses. And once made aware of the additional false insurance claims that postdated his termination from the Postal Inspection Service, Weber could have sought a further delay in his sentencing and could have sought, prior to sentencing, to withdraw his guilty plea and go to trial. Instead, however, Weber proceeded with his guilty plea, was sentenced, and then waited nearly two years before making his initial challenge and even longer to make the claims he asserts in his present petition. He has not provided a "sound reason[ ]" for his "failure to seek earlier relief." *Delhorno*, 915 F.3d at 450.

At a more basic level, however, Weber's petition founders on the requirement to demonstrate a fundamental error. Indeed, Weber has not shown *any* error in the

12

process that led to his guilty plea. He does not contend that his lawyers did not investigate the case adequately. He does not contend that his lawyer gave him bad advice that led him to plead guilty. He does not contend that he misunderstood the admissions he made in his plea agreement or the admissions he made under oath at his guilty plea hearing. And he does not contend that the plea colloquy was in any way inadequate. In addition, as the Court has previously found, and finds again now, Weber does not have a viable claim that the government withheld evidence from him or his lawyers. And, as the Court has found, Weber has offered no viable claim of any sort of government misconduct in the investigation or prosecution of his case.

Weber's claim, rather, is that although he believed himself to be innocent at the time, he pled guilty because he did not think he could win at trial—but that now he thinks, based on his claimed new evidence, that a trial could have or would have come out the other way. At a basic level, this is not a "fundamental error" of the sort needed to warrant granting a writ of coram nobis. In particular, it has been the law for fifty-five years that a defendant's claim of innocence does not render his guilty plea invalid, at least so long as there was a factual basis for the plea, which there unquestionably was in this case. *See North Carolina v. Alford*, 400 U.S. 25, 37–38 (1970). Indeed in this case—unlike in *Alford*, in which the defendant actually claimed *at the time* that he had not committed the offense to which he pled guilty—the factual basis for Weber's guilty plea came from Weber himself, and he admitted to it under oath during the guilty plea hearing.

Weber says that in deciding to plead guilty despite his (claimed) belief in his innocence, he made a determination that he was unlikely to prevail at trial. That's the

same sort of calculation that literally thousands of defendants make. It does not reflect a fundamental error in the proceedings. Rather, at most it reflects an error made by Weber himself: his decision not to fight the case at the time. His determination, years after the fact, that he made a bad decision does not provide a basis for giving him a do-over and issuing a writ of coram nobis.

In sum, Weber has failed to show that there was a fundamental error that would warrant disturbing the legitimate interest in the finality of his conviction—which, again, came on a voluntary guilty plea. *See Wilkozek*, 822 F.3d at 368; *Keane*, 852 F.2d at 205–06.

## Conclusion

For the reasons stated, the Court denies Weber's renewed petition for a writ of coram nobis [dkt. no. 113].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: January 5, 2026

14